2011 UT App 184

**STATE of Utah, in the interest of J.D. and E.D., persons under eighteen years of age.**

**V.D., Appellant,**

v.

**State of Utah, Appellee.**

**No. 20100406-CA.**

Court of Appeals of Utah.

June 9, 2011.

---

Mark L. Shurtleff and John M. Peterson, Salt Lake City, for Appellee.

Martha Pierce, Salt Lake City, Guardian Ad Litem.

Before Judges McHUGH, ORME, and CHRISTIANSEN.

## OPINION

McHUGH, Associate Presiding Judge:

¶ 1 V.D. (Mother) appeals the juvenile court's order terminating her parental rights with respect to her children, J.D. and E.D. (the Children). Mother asserts that there was insufficient evidence to demonstrate that termination was in the Children's best interest. We affirm.

## BACKGROUND

¶ 2 Mother and A.D. (Father) are the natural parents of the Children. At the time of trial, J.D. was nine years old and E.D. was seven years old.

¶ 3 In April of 2008, J.D. reported to the Division of Child and Family Services (DCFS) that Father had intentionally burned her, and the Children were temporarily placed in the custody of their aunt (Aunt). On August 21, 2008, after finding that Father had non-accidentally burned J.D.'s wrist with a cigarette, the juvenile court found J.D. to be an abused child and E.D. to be a neglected child as to Father. The juvenile court also found that the Children were dependent as to Mother.[1] This court affirmed the juvenile court's decision of Father's appeal. *See In re J.D.*, 2008 UT App 411U, 2008 WL 4899199 (per curiam).

¶ 4 After the 2008 adjudication, DCFS prepared a Child and Family Plan for Mother and Father, which required Mother to obtain a mental health assessment and to participate in individual counseling. The plan also required Father to obtain a psychological evaluation, complete a drug and alcohol assessment, participate in individual counseling, and provide adequate food, shelter, and clothing for the Children. Because Father

David J. Angerhofer, Mt. Pleasant, for Appellant.

---

1. " 'Dependent child' includes a child who is homeless or without proper care through no fault of the child's parent, guardian, or custodian." Utah Code Ann. § 78A–6–105(11) (2008).

failed to participate in the majority of court-ordered programs, DCFS cancelled Father's reunification services in October 2009. DCFS indicated, however, that Mother could regain custody of the Children if Father left the home. Several months passed before Father vacated the home and the Children were returned to Mother.

¶ 5 Initially, Mother and the Children did well enough that DCFS recommended closing the case with regard to Mother. Instead, the juvenile court left Mother's case open so that she could complete the Child and Family Plan. Rather than completing the plan as anticipated, Mother made a series of choices that were detrimental to the Children's welfare and that resulted in DCFS eventually filing the termination petition at issue.

¶ 6 After discovering that Father was having an extramarital affair with C.S., Mother became involved with C.S.'s husband, J.S. Shortly thereafter, and without DCFS approval, Mother and the Children moved in with J.S. and his children. Subsequently, J.S. was named as the alleged perpetrator in a referral to DCFS based on allegations of domestic violence and physical abuse. Then, while the Children were in his home, J.S. locked himself in his bedroom and overdosed on drugs. J.S. was transported to the hospital where he tested positive for opiates, PCP, and benzodiazepine. As a result of these events, J.S. was arrested and placed on a seventy-two hour hold. During J.S.'s absence, Mother and the Children continued to reside in J.S.'s trailer. A DCFS caseworker contacted Mother and made arrangements to check on the Children. Despite prior notice of the visit, the caseworker found J.S.'s trailer in such an unsanitary and unsafe condition that Mother was asked to have the Children stay elsewhere until the trailer could be cleaned. Thereafter, Mother took the Children to see J.S. in jail, despite the juvenile court's order that there be no contact between J.S. and the Children.

¶ 7 Based on this series of events, the Guardian Ad Litem (GAL) filed a Motion for Change of Custody. After an evidentiary hearing, the juvenile court found that the Children were neglected as to Mother and they were again placed in the custody of DCFS. For the second time, DCFS placed the Children with Aunt. In addition, Mother was ordered to complete a service plan that included a psychological evaluation and peer parenting classes. Mother's psychological assessment indicated that Mother suffered from several mood and personality disorders. Furthermore, Mother did not follow through with all of the service plan requirements. For example, Mother's peer parenting class was cancelled due to her failure to attend. Mother did, however, regularly attend visitation with the Children and she completed an eight-week parenting class in February 2010.

¶ 8 In March 2010, after having custody of the Children since August 2009, DCFS filed a petition to terminate the parental rights of both Mother and Father. The juvenile court held hearings on the petition and entered an order terminating Mother's and Father's parental rights on May 4, 2010. The juvenile court found that Mother and Father were unfit parents, were unable or unwilling to remedy the circumstances that caused the Children to be in out-of-home placements, and had each experienced a failure of parental adjustment, and that Father had made only token efforts to avoid being an unfit parent. The juvenile court also determined that it was in the best interest of the Children to terminate both Mother's and Father's parental rights. Each parent separately appealed the juvenile court's order, and this court has previously affirmed the termination of Father's parental rights. *See In re J.D.*, 2010 UT App 212U, 2010 WL 3047014 (per curiam). In this appeal, we consider the termination of Mother's parental rights.

## ISSUE AND STANDARD OF REVIEW

¶ 9 Mother argues that the State and GAL did not establish by clear and convincing evidence that it was in the Children's best interest to terminate her parental rights under Utah Code section 78A-6-503 because they did not provide sufficient evidence relevant to the best interest inquiry under that section. *See* Utah Code Ann. § 78A-6-503 (2008). We "review the juvenile court's factual findings based upon the clearly erroneous standard." *In re E.R.*, 2001 UT App 66,

¶ 11, 21 P.3d 680; *see also* Utah R. Civ. P. 52(a) ("Findings of fact ... shall not be set aside unless clearly erroneous...."). A finding of fact is clearly erroneous when it is against the clear weight of the evidence. *See In re E.R.*, 2001 UT App 66, ¶ 11, 21 P.3d 680. Additionally, we give the juvenile court a "'wide latitude of discretion as to the judgments arrived at based upon not only the court's opportunity to judge credibility firsthand, but also based on the juvenile court judge's' 'special training, experience and interest in this field.'" *Id.* (quoting *In re F.D.*, 14 Utah 2d 47, 376 P.2d 948, 951 (1962)).

## ANALYSIS

¶ 10 The Utah Legislature has adopted a "judicial process for voluntary and involuntary severance of the parent-child relationship, designed to safeguard the rights and interests of all parties concerned and promote their welfare and that of the state." Utah Code Ann. § 78A–6–503(1). That process involves a two-part analysis under which, "if a parent is found ... to be unfit ..., the court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered." *Id.* § 78A–6–503(2). Interpreting this legislation, the Utah Supreme Court has explained that "to terminate parental rights, the juvenile court must make two separate findings. First, it must find grounds for termination under Utah Code section 78A–6–507.... Second, the juvenile court must find that termination of the parent's rights is in the best interest of the child." *In re A.C.M.*, 2009 UT 30, ¶ 23, 221 P.3d 185 (citations omitted). The juvenile court here determined that both prongs of the termination analysis had been proved by clear and convincing evidence. Mother does not dispute the court's finding that there are grounds for termination of her parental rights under Utah Code section 78A–6–507. *See* Utah Code Ann. § 78A–6–507. Rather, she contends that the evidence was insufficient to

support the juvenile court's finding that termination of her parental rights is in the best interest of the Children.[2] Before we begin our analysis of that issue, we first address the GAL's suggestion that because we affirmed the termination of Father's parental rights, we must also affirm the termination of Mother's rights.

### I. It Is Appropriate To Consider the Termination of Mother's Parental Rights Separately from the Termination of Father's Parental Rights.

¶ 11 Mother and Father are two separate individuals who each have a constitutional right to parent their children. *See Jensen v. Cunningham*, 2011 UT 17, ¶ 72, 250 P.3d 465 ("In a long line of precedent, this court has recognized parental rights as a fundamental component of liberty protected by article I, section 7 [of the Utah Constitution]."); *In re K.S.*, 737 P.2d 170, 172 (Utah 1987) ("The parent-child relationship is constitutionally protected, and termination of that relationship is a drastic measure to be used only when the evidence is clear and convincing that the parent is unable or unwilling to perform the duties and responsibilities of a parent."). Before either parent's parental rights can be terminated, the juvenile court must find by clear and convincing evidence that both the particular parent is unfit based on one of the grounds enumerated in Utah Code section 78A–6–507, *see* Utah Code Ann. § 78A–6–507, and that it is in the best interest of the child that the parent's rights be terminated, *see* Utah Code Ann. § 78A–6–503(2).

¶ 12 Evidence of Father's conduct is relevant to the grounds for terminating Mother's parental rights, in part, because Mother has a parental duty to protect the Children from abuse and neglect. *See In re T.M.*, 2006 UT App 435, ¶ 20, 147 P.3d 529 (collecting cases and noting that "Utah case law indicates that courts have minimal empathy for parents whose strong emotional ties to their spouses

2. Mother also argues that it is in the best interest of the Children to make Aunt their permanent guardian. Although this appeal is limited to the termination of Mother's parental rights, as opposed to any future decisions by the juvenile court with respect to the placement of the Children, we note that the record reflects that Aunt was unable to continue as the primary caretaker of the Children.

or significant others jeopardize their children's safety"). In addition, evidence of unfitness may be probative of both factors of the termination analysis. *See In re S.T.*, 928 P.2d 393, 399 (Utah Ct.App.1996) ("Bifurcating the [parental termination] analysis does not require courts to separately hear and consider evidence pertaining to unfitness and best interests. Instead, bifurcation requires courts to first find statutory grounds for termination before considering whether termination is in the children's best interest."). However, evidence of Father's abusive conduct is less helpful in proving that the termination of Mother's parental rights is in the best interest of the Children. This is because the best interest analysis includes consideration of the impact of termination on the child, rather than simply on evaluating whether the statutory grounds for termination have been met. *Compare* Utah Code Ann. §§ 78A–6–506 to –508 (setting forth the grounds for termination and evidentiary presumptions and factors that shall be considered in determining if grounds for termination exist), *with id.* §§ 78A–6–509 to –510 (setting forth factors that shall be considered in determining whether termination of the parent's parental rights is in the best interest of the child). *See generally In re T.M.*, 2006 UT App 435, ¶ 21, 147 P.3d 529 (affirming the juvenile court's finding that terminating father's parental rights was in the children's best interest where the juvenile court weighed the impact of the father's poor choices on the children, the stability and love provided by the foster home, and the children's close bond with the foster family, against the father's efforts to complete his treatment plan, his commitment to provide for the children, his drug-free and employed status, and the mutual love and bond between the father and the children). The impact of the termination of a parent's parental rights on the child necessarily is affected by the child's unique relationship with that parent. *See In re S.L.*, 1999 UT App 390, ¶ 36, 995 P.2d 17 (" 'If the parent-child relationship has been destroyed by the parent's conduct, or lack of conduct, it is usually in the best interest of the child to terminate that relationship and allow the child an opportunity to establish a meaningful relationship with loving, responsible parents.' ") (quoting *In re J.R.T.*, 750 P.2d 1234, 1238 (Utah Ct.App.1988)). Here, the evidence suggests that the bond between the Children and Mother may be stronger than that between the Children and Father.

¶ 13 Father intentionally burned J.D. with a cigarette, refused to comply with the DCFS service plan, and made no serious effort to visit the Children after their removal. Indeed, as of the time of trial, Father had not had contact with the Children for seven months. In contrast, Mother visited regularly with the Children, completed parts of the service plan, and according to one of the permanency workers, is "very bonded" with the Children who "definitely know their mom ... and are connected with her." Thus, it is appropriate for this court to review whether the record evidence on the best interest question, although enough to support termination of Father's parental rights, is also sufficient to support termination of Mother's parental rights, despite her greater role in the Children's lives and her different acts of unfitness. We undertake that review now.

II. In Exercising Its Broad Discretion in Determining Whether Termination Is in the Children's Best Interest, the Juvenile Court Must Consider Specific Factors.

¶ 14 In support of her argument that the juvenile court's best interest finding is clearly erroneous, Mother relies on Utah Code section 78A–6–509. *See* Utah Code Ann. § 78A–6–509 (2008).[3] That provision sets forth certain factors that the court must consider, but to which it is not limited, in determining whether the parental rights of a parent who is not in physical custody of a child should be terminated:

(1) If a child is not in the physical custody of the parent or parents, the court, in determining whether parental rights

---

**3.** Although the Juvenile Court Act of 1996 has been renumbered, the specific considerations for children not in the physical custody of their parents have not changed. *Compare* Utah Code Ann. § 78A–6–509 (2008), *with* Utah Code Ann. § 78–3a–409 (2002).

should be terminated *shall consider*, but is not limited to, the following:

> (a) *the physical, mental, or emotional condition and needs of the child and his desires regarding the termination,* if the court determines he is of sufficient capacity to express his desires; and
>
> (b) *the effort the parent or parents have made to adjust their circumstances, conduct, or conditions to make it in the child's best interest to return* him to his home after a reasonable length of time, including but not limited to:
>
>> (i) *payment of* a reasonable portion of substitute physical care and *maintenance,* if financially able;
>>
>> (ii) maintenance of regular parent-time or other *contact with the child that was designed and carried out in a plan to reunite the child with the parent or parents;* and
>>
>> (iii) maintenance of *regular contact and communication with the custodian of the child.*
>
> (2) For purposes of this section, the court shall disregard incidental conduct, contributions, contacts, and communications.

*Id.* § 78A–6–509 (emphases added).

¶ 15 Although Utah Code section 78A–6–509 does not expressly refer to the best interest prong of the termination analysis, "[t]he connection of the specified factors with the best interests of the children is plain." *In re T.W.H.,* 2004 UT App 128U, para. 5, 2004 WL 1368310 (mem.) (per curiam) (interpreting factors relevant to the termination of parental rights of children in foster care as set forth in Utah Code section 78–3a–409— now renumbered as section 78A–6–509—in conducting a best interest analysis); *see also In re R.A.J.,* 1999 UT App 329, ¶ 20, 991 P.2d 1118 ("The juvenile court properly considered the statutory factors under section 78–3a–409 [now renumbered as section 78A–6–509] in conducting its best interest analysis.").

¶ 16 According to Mother, the State presented no evidence on the Children's "physical, mental, [or] emotional condition [or] needs," and also neglected to provide any evidence concerning the children's "desires regarding the termination." Consequently, Mother contends that the juvenile court's finding that it is in the Children's best interest to terminate her parental rights cannot be supported by the evidence and is, therefore, clearly erroneous. As support for her position, Mother cites *In re R.A.J.,* 1999 UT App 329, 991 P.2d 1118.

¶ 17 There, the juvenile court denied the foster parents' petition to terminate the biological parents' rights to parent their child, R.A.J., despite its conclusion that "separate grounds existed for the termination of each of the parents' parental rights." *See id.* ¶ 4. The juvenile court entered factual findings establishing that R.A.J. "has done well in the care of the foster family; they love her and she loves them. She is happy there and both she and the foster parents wish her to stay long term. The child has not visited her mother for more than a year, but the reasons are unclear...." *See id.* ¶ 14. However, it concluded that the absence of evidence concerning R.A.J.'s relationship with the mother and the benefit to be gained over the existing permanent guardianship by terminating mother's parental rights, combined with the uncertainty about the reasons for the mother's failure to visit, rendered the proof on the best interest question insufficient. *See id.* ¶¶ 14–15.

¶ 18 On appeal, this court affirmed the denial of the foster parent's petition, stressing that the juvenile court is afforded wide discretion to weigh the evidence presented and to determine whether the termination test has been satisfied by clear and convincing evidence. *See id.* ¶¶ 11–12, 17. Because the juvenile court judge had "applied his best judgment to the matter, as is his responsibility," the court of appeals could "not say with certainty that he [was] incorrect." *See id.* ¶ 17. Therefore, we concluded that the juvenile court "did not abuse [its] discretion" in denying the petition for termination of the parental rights of the biological parents. *See id.; cf. In re J.O.,* 2008 UT App 220, ¶ 21, 189 P.3d 90 (affirming juvenile court's finding that termination of mother's parental rights was in the best interest of the children and stating that "even if we were persuaded by Mother's characterization of the bond be-

tween herself and the Children, it is not this court's prerogative to substitute our judgment for that of the juvenile court").[4]

¶ 19 Because the decision in *In re R.A.J.* was driven by the deferential standard of review under which we examine termination decisions of the juvenile courts, it is not helpful to Mother's argument. Here, the juvenile court carefully considered the evidence and applied its expertise, ultimately reaching the conclusion that termination was appropriate. As in *In re R.A.J.*, we afford the juvenile court considerable deference when reviewing that decision. *See* 1999 UT App 329, ¶ 12, 991 P.2d 1118 ("It falls exclusively on the [juvenile court] judge to decide whether or not the evidence presented rises to the level of clear and convincing proof of the facts alleged.").

III. We Cannot Conclude that the Juvenile Court Exceeded Its Considerable Discretion in Finding by Clear and Convincing Evidence that It Is in the Best Interest of the Children To Terminate Mother's Parental Rights.

■ ¶ 20 Despite its concern about the State's "sparse" presentation of best interest evidence at the hearing, the juvenile court determined that there was enough evidence presented for it to find by clear and convincing evidence that terminating Mother's parental rights was in the Children's best interest. Although the juvenile court did not expressly refer to the statute, it "properly considered the statutory factors under section ... 78-3a-409 [now renumbered as section 78A-6-509] in conducting its best interest analysis." *See id.* ¶ 20; *see also In re S.T.*, 928 P.2d 393, 400 (Utah Ct.App.1996) ("While the juvenile court did not expressly refer to the statute [section 78-3a-409, now renumbered as section 78-6-509] when con-

sidering these factors, the court's findings are replete with detailed discussion of the offered services, the children's conditions and needs, and appellants' efforts.").

¶ 21 The juvenile court here initially indicated that "the only best interest evidence provided by [DCFS], was that [Aunt] likely could not keep the [C]hildren," but then acknowledged that the GAL had elicited testimony from the caseworker that the Children were "adorable" and "adoptable," "could find adoptable homes," and from Aunt that the Children were "fun to be around" and "easy for others to love." Although the juvenile court expressed frustration with the fact that these statements "were conclusory" and that the testimony included no "information [about] why the caseworker believed the [C]hildren were adoptable," a reasonable inference from the testimony is that the Children suffered from no unusual "physical, mental, or emotional condition[s][or] needs," *see* Utah Code Ann. § 78A–6–509(1)(a) (2008), that would negatively affect their chances of finding fit and competent parents through adoption. Furthermore, Mother concedes that the same DCFS permanency worker who testified to the Children's connection with Mother also stated that the Children had bonded with Aunt, that they were doing well, and that their needs were being met. Additionally, the juvenile court found, "The [C]hildren are well cared for by [Aunt] and are bonded with her. Indeed, [Aunt] has cared for the girls off and on for most of their lives," including "a two year period when [Mother and Father] resided in Wendover, Utah and lived out of their car." Thus, the juvenile court was provided some evidence suggesting that the Children were mentally, physically, and emotionally well and that they were capable of bonding in a stable home despite their connection with Mother. *See id.* (requiring that the juvenile

---

4. Other decisions from this court have also recognized that termination may be inappropriate despite satisfaction of the unfitness prong of the termination test. *See In re B.M.S.*, 2003 UT App 51, ¶¶ 17–20, 65 P.3d 639 (upholding the juvenile court's refusal to terminate Father's parental rights despite abandonment of child, where cutting off his child support obligation was not in the child's best interest); *In re E.R.*, 2001 UT App 66, ¶ 13, 21 P.3d 680 ("It is conceivable that grounds for termination may exist, but termination nonetheless is not in the best interest of the children."); *In re M.C.*, 940 P.2d 1229, 1237–38 (Utah Ct.App.1997) (remanding to the juvenile court for entry of adequately detailed findings, stating, "Nothing in its findings deals with the welfare and best interest of [the children] and whether the children need protection from their mother. The findings focus all but exclusively on the parent and her culpability.").

court consider "the physical, mental, or emotional condition and needs of the child and his desires regarding the termination. . . .").[5] In contrast, the juvenile court's findings of fact indicate that Mother's psychological assessment included the report that "[s]everal people involved with this case expressed concern about [Mother's] ability to attend to the needs of her children, in regards to daily functioning, cleanliness, hygiene, and safety."

¶ 22 Next, as required by section 78A–6–509(1)(b), the juvenile court weighed the fact that, due to Mother's unfitness and her inadequate efforts to adjust "the circumstances, conduct[,] or conditions," *see* Utah Code Ann. § 78A–6–509(1)(b), enough to make it in the Children's best interest to return them to Mother's home, the Children could not be returned to her custody. In particular, the juvenile court made detailed findings about Mother's bizarre behavior, vagabond lifestyle, denial about Father's drug addiction, plans to reunite the Children with Father, emotional instability, inability to attend to the daily needs of the Children, untreated mental illness and personality disorders, disregard for the advice of DCFS, and history of poor decisions. While the juvenile court did find that Mother had maintained contact with the Children, *see id.* § 78A–6–509(1)(b)(ii) (requiring the court to consider the efforts of the parent to maintain "regular parent-time or other contact with the child that was designed and carried out in a plan to reunite the child with the parent or parents"), the juvenile court's findings of fact indicate that she had not been providing for their economic needs, *see id.* § 78A–6–509(1)(b)(i) (requiring the court to consider the effort of the parent to "pay[ ] a reasonable portion of substitute physical care and maintenance, if financially able"). For example, the juvenile court referred to Aunt's testimony that Mother did not adequately care for, feed, or provide medical care for the Children, and that Mother did not contribute to the cost of surgery one of the Children

required as an infant. The factual findings also indicate that Aunt's inability to adopt the Children is due to the economic impact of day care costs, which are apparently not being paid by Mother.

¶ 23 Consistent with Utah Code section 78A–6–509's indication that the juvenile court's consideration "is not limited to" the factors enumerated, *see id.* § 78A–6–509(1), the juvenile court also considered the fact that Aunt was no longer in a position to adopt the Children. Acknowledging that the lack of an adoptive placement weighed against terminating Mother's parental rights, the juvenile court correctly concluded that it was not controlling with regard to the Children's best interest. *See In re B.S.*, 2006 UT App 462U, para. 3, 2006 WL 3317037 (mem.) (per curiam) ("[A] child's adoption status is only one factor to consider in the determination of the best interests of the children."). Ultimately, the juvenile court determined that failing to terminate Mother's parental rights would leave the Children in a state of uncertainty and would undermine the "overarching purpose [of Utah's child welfare laws, which] is to provide stability and permanency for abused and neglected children, and to end the legal limbo of state custody as quickly as possible," *In re S.L.*, 1999 UT App 390, ¶ 42, 995 P.2d 17 (internal quotation marks omitted). The juvenile court concluded that it was in the Children's best interest to terminate Mother's parental rights in order to allow them "to move forward and to have the opportunity to be placed with a loving, stable permanent family."

¶ 24 Furthermore, while perhaps this should not have been a "close case," neither this court nor the juvenile court can ignore the additional "hurdle" placed by the legislature between a finding of unfitness and the termination of parental rights. *See infra* ¶ 33 & note 1. Whether the best interest analysis is resolved against termination despite parental unfitness often, rarely, or almost never, the legislature has deemed that

---

5. Mother is correct that the record is devoid of evidence concerning the Children's desires with respect to termination. *See* Utah Code Ann. § 78A–6–509(1)(a) (2008) (providing that juvenile court shall consider the desires of the children regarding termination, if the court determines

that the child is of sufficient capacity to express his or her desires). However, even assuming that the Children expressed a desire to maintain a relationship with Mother, we cannot conclude that the juvenile court's best interest determination is clearly erroneous.

"the welfare and the best interest of the child [are] of paramount importance in determining whether termination of parental rights shall be ordered," *see* Utah Code Ann. § 78A–6–503(2) (2008), and has mandated that the juvenile court consider specific factors in making that determination, *see id.* § 78A–6–509. We are not willing to substitute our judgment as to the wisdom of this requirement for that of the legislature by excusing the petitioner from presenting evidence that allows the juvenile court to undertake that analysis or to encourage perfunctory treatment of an issue the legislature deems of paramount importance.

¶ 25 In *Jensen v. Cunningham*, 2011 UT 17, 250 P.3d 465, the Utah Supreme Court recently examined the tension between "the integrity of the family and the parents' inherent right and authority to rear their own children," *see id.* ¶ 72 (alteration and internal quotation marks omitted), and "the state's important interest in protecting children from harm," *id.* ¶ 74. Children also have rights, including the right to support, *see Department of Human Servs. ex rel. Parker v. Irizarry*, 945 P.2d 676, 679 (Utah 1997), and the right to inherit, to sue for wrongful death, and to receive veteran's benefits, *see In re J.P.*, 648 P.2d 1364, 1366 n. 1 (Utah 1982); *see also Jones v. Barlow*, 2007 UT 20, ¶ 50, 154 P.3d 808 (Durham, C.J., dissenting) ("As the legislature recognized by enacting visitation statutes, children have a right to maintain relationships with their parents...."). It is the legislature's role "to safeguard the rights and interests of all parties concerned and promote their welfare and that of the state." Utah Code Ann. § 78A–6–503(1). The two-prong termination test is the result of the legislature's collective judgment of the proper balance of those competing interests.

¶ 26 Had the legislature promulgated a termination test that required the juvenile court to consider the best interest of the child unless the parent was particularly un-

fit,[6] or only when termination was based on a "less objectively demonstrable ground, such as failure of parental adjustment, token efforts, or voluntary relinquishment," *see infra* ¶ 33 & note 1 (citation and internal quotation marks omitted), conflating the two prongs of the termination statute might be appropriate. However, the legislature has not done so. Rather, in every case, the best interest of the child is of paramount importance in determining whether the child-parent relationship should be permanently severed.

¶ 27 Perhaps in recognition of the importance of this inquiry, the legislature has thoughtfully identified factors that the juvenile court must consider in performing the best interest analysis. Even if that inquiry is typically resolved in favor of termination, the question must be asked so that the special, even rare, child with a "physical, mental, or emotional condition or need[ ]," who desires a continuing relationship with the parent and who would be benefitted by having ongoing contact of some kind, is not overlooked due to an assumption that termination "follows almost automatically" from unfitness. *See infra* ¶ 34. As Judge Wilkins stated in *In re S.L.*, 1999 UT App 390, 995 P.2d 17, where

> [t]he legislature has reached a balance between the right of a parent to raise his or her child and the child's right to be raised in a caring, loving, safe, and nurturing environment[, t]hose who believe this balance to have been struck improperly ... must take that belief to the legislature for action. By being as precise as it has[,] ... the legislature has left little wiggle room for the court.

*Id.* ¶ 59 (Wilkins, P.J., concurring). The juvenile court here had no wiggle room. It was required to consider the factors identified by the legislature and to determine whether termination was in the best interest of the Children before terminating Mother's rights.

---

**6.** Indeed, the level of parental unfitness must always be compelling to overcome the parent's constitutional right to rear his or her own children. *See* Utah Code Ann. § 78A–6–503(2) (2008) ("Whenever possible family life should be strengthened and preserved...."); *In re M.C.*,

940 P.2d 1229, 1238 (Utah Ct.App.1997) ("Even after a finding of serious physical abuse has been made, the trial court still has discretion in deciding whether to grant or deny a petition for termination.").

¶ 28 However, the juvenile court's frustration was not a comment on whether evidence of the Children's best interest could have been easily provided; it was directed at the fact that no attempt was made to assist the court with this second step of the termination analysis by focusing the evidence on the required factors. The State's more typical and professional practice of providing evidence specifically designed to prove that termination is in the best interest of the child [7] saves the juvenile court and this court from the task of combing the record in an effort to ascertain whether the evidence directed primarily at unfitness also happens to support a best interest determination in favor of termination. Here, we agree with the juvenile court that it did.

¶ 29 Although the juvenile court's task would have been aided by the presentation of more evidence specifically directed to the best interest issue, its thoughtful analysis and careful consideration of the evidence that was presented supports its ultimate determination concerning the best interest of the Children. The juvenile court concluded that irrespective of whether a parent-child relationship remained, whether the Children desired to maintain contact with Mother, or whether adoption was likely, the Children's best interest would be served by terminating Mother's parental rights so that the Children would have at least the opportunity to find the stability that Mother is unable to provide. Where "[t]he [juvenile] judge has applied his best judgment to the matter," and "[i]t falls exclusively on the judge to decide whether or not the evidence presented rises to the level of clear and convincing proof," we cannot conclude that his finding that termination of Mother's parental rights is in the best interest of the Children is clearly erroneous. *See In re R.A.J.*, 1999 UT App 329, ¶¶ 12, 17, 991 P.2d 1118; *see also In re J.O.*, 2008 UT App 220, ¶ 21, 189 P.3d 90 (upholding the juvenile court's finding that termination was in the best interest of the children, despite the continuing existence of some bond of affection between children and parent, "in order to put an end to the destructive life cycle of which the Children have been a part for so long and to give the Children the security of a permanent home" (alterations and internal quotation marks omitted)). "When a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435.

## CONCLUSION

¶ 30 The juvenile court's finding that termination of Mother's parental rights is in the Children's best interest is not clearly erroneous. Consequently, the juvenile court did not exceed its considerable discretion in terminating Mother's parental rights to J.D. and E.D.

¶ 31 Affirmed.

¶ 32 I CONCUR: MICHELE M. CHRISTIANSEN, Judge.

ORME, Judge (concurring specially):

¶ 33 I readily concur in the court's judgment of affirmance and in much of the analysis of the lead opinion. I write separately only because I fear that by belaboring the "best interest" requirement as we do, we

---

7. Our review of decisions considering challenges to a best interest finding indicates that most decisions include more specific evidence about the "physical, mental, and emotional condition and needs" of the child. *See, e.g., In re T.H.*, 2009 UT App 340U, para. 5, 2009 WL 3863681 (mem.) (per curiam) (child had thrived in foster home and if not returned to his mother, wished to be adopted by foster parents); *In re C.B.*, 2009 UT App 290U, para. 7, 2009 WL 3215067 (mem.) (per curiam) (children had bonded with foster family, foster parents were willing to adopt them, and the children's behavior and developmental lags were improving); *In re A.M.*, 2009 UT App 118, ¶ 32, 208 P.3d 1058 (children were doing well in their new schools, were frightened of their father due to his two attempts to have their mother killed by a third party, and were having their financial and emotional needs met by their mother and stepfather); *In re A.L.O.*, 2008 UT App 331U, para. 6, 2008 WL 4183017 (mem.) (per curiam) (children's special mental health and emotional issues required permanent stable homes that mother was unwilling or unable to provide); *In re M.R.S.*, 2003 UT App 124U, para. 4, 2003 WL 21294878 (mem.) (father's visits caused the children "stress, disturbed their emotional equilibrium, and confused them," and the children were "happy and flourishing in their foster home, where they were well cared for and loved" (internal quotation marks omitted)).

inadvertently suggest that this was a close case. I fear that the lead opinion may be taken to mean that once it has been determined, by clear and convincing evidence, that there are grounds to terminate parental rights—even where the ground is parental unfitness—the further conclusion that termination will be in the children's best interest presents a substantial hurdle.[1] Such is not the case.

¶ 34 Procedurally, "[b]ifurcating the [parental termination] analysis does not require courts to separately hear and consider evidence pertaining to unfitness and best interest." *In re S.T.*, 928 P.2d 393, 399 (Utah Ct.App.1996). And legally, "[i]f the parent-child relationship has been destroyed by the parent's conduct, or lack of conduct, it is usually in the best interest of the child to terminate that relationship." *In re J.R.T.*, 750 P.2d 1234, 1238 (Utah Ct.App.1988). Thus, we have referred to it as being merely "conceivable" that "grounds for termination exist, but that termination nonetheless is not in the best interest of the children." *In re E.R.*, 2001 UT App 66, ¶ 13, 21 P.3d 680. Indeed, although the requirement of bifurcated analysis is clearly established by statute, *see* Utah Code Ann. § 78A–6–506(3) (2008), and jurisprudence, *see In re R.A.J.*, 1999 UT App 329, ¶ 7, 991 P.2d 1118, as a practical matter, where grounds for termination are established, the conclusion that termination will be in the children's best interest follows almost automatically. *But see id.* ¶¶ 21–22 (holding that there is no express presumption that once grounds for termination are found, termination is in the child's best interest).

¶ 35 Cases where grounds for termination are found but termination is held not to be in the child's best interest are rare. Of the many cases cited in the lead opinion, only three are in this category. In one, the tangible benefit to the child of continuing the parental relationship was obvious, namely continuation of the father's child support obligation. *See In re B.M.S.*, 2003 UT App 51, ¶¶ 17–20, 65 P.3d 639. In another, the lead opinion concedes that the case "was driven by the deferential standard of review under which we examine termination decisions of the juvenile courts." *Supra* ¶ 19. *See In re R.A.J.*, 1999 UT App 329, ¶ 12, 991 P.2d 1118. And in the third case, this court refused to uphold the juvenile court's decision that termination was not in the best interest of the child absent explicit findings by the juvenile court to support that conclusion. *See In re E.R.*, 2001 UT App 66, ¶ 14, 21 P.3d 680.

¶ 36 That the two requirements, while theoretically distinct, usually are satisfied hand-in-glove, is demonstrated by this case, and most easily shown by posing and answering this rhetorical question: Given "Mother's bizarre behavior, vagabond lifestyle, denial about Father's drug addiction, plans to reunite the Children with Father, emotional instability, inability to attend to the daily needs of the Children, untreated mental illness and personality disorders, ... and history of poor decisions," *supra* ¶ 22, is it in the best interest of the *children* to preserve Mother's parental rights? Of course not. And such will be true in the vast majority of cases where parental unfitness has been

---

1. As a practical matter, the "best interest" requirement is likely to present a more substantial hurdle in those cases where the ground is not "unfitness," but one of the less objectively demonstrable grounds, such as "failure of parental adjustment," "token efforts," or voluntary relinquishment, *see* Utah Code Ann. § 78A–6–507(1)(e)-(g) (2008). The constitutional concern about parental rights and the legislative interest in assuring that termination occur only when it is in the children's best interest, *see In re J.P.*, 648 P.2d 1364 (Utah 1982) (discussing the constitutional right of parents to rear their children free of state intervention and the "paramount" importance of the children's best interest in deciding whether to terminate parental rights), are no doubt at their apex in those cases where the grounds for termination are themselves less compelling. Indeed, it may be that something of a sliding scale exists, requiring a heightened level of "best interest" scrutiny where the reason for terminating parental rights is inherently less urgent, and vice versa. Thus, if grounds to terminate parental rights exist because of a sustained pattern of physical abuse, a conclusion that termination of parental rights is in the child's "best interest" will likely follow without the need for extensive analysis. Conversely, if the necessity for termination of parental rights is less evident, such as where termination is based on a more subjective determination like "failure of parental adjustment," *see* Utah Code Ann. § 78B–6–507(1)(e), the "best interest" determination will likely take on added importance.

found, by the requisite clear and convincing evidence.